J-A18021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BEECHER'S AUTO SALVAGE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CONSERVIT, INC. | |
| Appellant | No. 2047 MDA 2014 |

Appeal from the Judgment Entered November 26, 2014
In the Court of Common Pleas of Franklin County
Civil Division at No: 2010-01074

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and MUSMANNO, J.J.

MEMORANDUM BY STABILE, J.:                **FILED OCTOBER 29, 2015**

Appellant, Conservit, Inc., appeals from the November 26, 2014 judgment entered in favor of Appellee Beecher's Auto Salvage.  We affirm.

The trial court recited the relevant facts:

> [Appellee] operates an automobile and truck salvage business in Franklin County, Pennsylvania.  [Appellant] is a recycling center that buys and sells scrap metal.  Specifically, [Appellant] takes in scrap metal, shreds it, converts it to frag, and sells the frag.  [Appellee] alleges that in August 2008 [Appellant] and [Appellee] entered into an agreement whereby [Appellant] would purchase scrap metal from [Appellee's] inventory of automobiles and trucks at a purchase price of $13.50 per hundred pounds.  On several occasions in January and February of 2009 [Appellant] loaded, crushed and removed scrap metal from [Appellee's] lot.  On each occasion [Appellant] issued a ticket indicating the date and the amount of the metal removed.  The total amount of metal removed from [Appellee's] lot was 1,252,630 pounds.  [Appellee] maintains that at the agreed upon price of $13.50 per hundred pounds a total of $169,105.05 was due to [Appellee].  To date [Appellant] has

> paid [Appellee] $110,000. Therefore, [Appellee] is seeking the difference of $59,105.05.

Trial Court Opinion, 9/4/14, at 1-2.

Appellee commenced this action on March 18, 2010 with a complaint alleging breach of contract, promissory estoppel and unjust enrichment. The trial court overruled Appellant's preliminary objections and, after the pleadings closed, denied Appellee's motion for summary judgment. Prior to trial, Appellee filed a motion in *limine* seeking to preclude Appellant from contradicting judicial admissions Appellant believed Appellee made in its pleadings. The trial court denied that motion on April 9, 2014. The parties proceeded to a bench trial on May 6 and 7, 2014. The trial court entered a verdict in Appellee's favor on September 4, 2014. Appellant filed a timely post-trial motion, which the trial court denied on November 14, 2014. On November 26, 2014, the trial court entered judgment[1] in favor of Appellee in the amount $59,105.05. This timely appeal followed.

Appellant raises five assertions of trial court error:

---

[1] Appellant purportedly appealed from the order denying its post-trial motion. The appealable final order is the judgment. **See Fanning v. Davne**, 795 A.2d 388, 391 (Pa. Super. 2002) ("An appeal from an order denying post-trial motions is interlocutory. An appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions."), *appeal denied*, 825 A.2d 1261 (Pa. 2003). Since the verdict was reduced to judgment on November 26, 2014, we will treat this as an appeal from the judgment. We have amended the caption accordingly.

1. Did the trial court commit an error of law and abuse its discretion by concluding that the parties' alleged oral contract was outside of the applicable statute of frauds and by upholding the validity of Appellee's breach of oral contract claim against Appellant?

2. Did the trial court commit an error of law and abuse of discretion by failing to conclude that the pleadings filed in this matter by the Appellee served as a bar to any recovery by Appellee on its breach of oral contract claim?

3. Did the trial court commit an error of law and abuse of discretion when it reached the conclusion that the parties had 'An intent to set a price and that a price was agreed upon,' when the trial record clearly does not support this finding?

4. Did the trial court commit an error of law in its application of [13 Pa.C.S.A. § 2305(a)] to the facts of this case?

5. Did the trial court commit an error of law and abuse of discretion by concluding in its September 4, 2014 opinion that '[the parties'] conversation in November 2008 was confirmation of the 2008 oral agreement,' as said conclusion is against the weight of the direct evidence in the record, and is further in direct contradiction to the judicial admissions set forth in the Appellee's pleadings filed in this matter?

Appellant's Brief at 6.

We conduct our review as follows:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a

- 3 -

question of law, our scope of review is plenary. The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

***Allegheny County Hous. Auth. v. Johnson***, 908 A.2d 336, 340 (Pa. Super. 2006) (quotation marks omitted).

Appellant first argues that the applicable statute of frauds bars enforcement of the alleged agreement because the parties never reduced the agreement to writing. Appellant also argues that the trial court erred in finding that the agreement falls outside the statute of frauds based on Appellant's acceptance of and payment for Appellee's scrap metal.

The applicable statute of frauds is set forth in Pennsylvania's Uniform Commercial Code:

> **(a) General rule.--**Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

13 Pa.C.S.A. § 2201(a).

Section 2201(c) provides for the enforceability, in some circumstances, of contracts that do not comply with § 2201(a):

> **(c) Enforceability of contracts not satisfying general requirements.--**A contract which does not satisfy the

- 4 -

requirements of subsection (a) but which is valid in other respects is enforceable:

[*    *    *]

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 2606).

13 Pa.C.S.A. § 2201(c)(3).

Section 2606, in turn, specifies actions that constitute acceptance of goods:

**(a) General rule.**--Acceptance of goods occurs when the buyer:

(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;

(2) fails to make an effective rejection (section 2602(a)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the ownership of the seller; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

**(b) Part of commercial unit.**--Acceptance of a part of any commercial unit is acceptance of that entire unit.

13 Pa.C.S.A. § 2606. Appellant relies in particular on paragraph one of the comment to § 2606:

1.   Under this Article 'acceptance' as applied to goods means that the buyer, pursuant to the contract, takes particular goods which have been appropriated to the contract as his own, whether or not he is obligated to do so, and whether he does so by words, action, or silence when it is time to speak. If the goods conform to the contract, acceptance amounts only to the performance by the buyer of one part of his legal obligation.

13 Pa.C.S.A. § 2606, comment. Appellant emphasizes the use of the word "contract" three times within the comment. Appellant's Brief at 15.

As we understand Appellant's argument, the trial court erred in relying on § 2201(c)(3) to determine that the parties' agreement falls outside of the statute of frauds because § 2201(c)(3), with its incorporation of § 2606, applies only where the parties have formed a valid oral contract. Appellant argues the parties did not form a valid oral contract because the record contains no evidence the parties agreed on the total volume of scrap metal Appellant would purchase from Appellee and no evidence of an agreed upon price per unit. Appellant's Brief at 16. We will address these issues below, in response to Appellant's remaining assertions of error.

For present purposes, we need only assess the trial court's decision that the statute of frauds does not apply in this case because the parties exchanged goods for money. Appellant does not dispute that it removed more than one million pounds of scrap metal from Appellee's property and paid Appellee $110,000.00 in exchange. Partial payment is a reliable indicator of the existence of a contract and sufficient to remove the bar of the statute of frauds. *See W.I. Snyder Corp. v. Caracciolo*, 541 A.2d 775, 779 (Pa. Super. 1988). The trial court did not err in finding that

Appellant's payment[2] for scrap metal sufficient to remove the bar of the statute of frauds under § 2201(c)(3). Appellant's first argument does not merit relief.

Next, Appellant argues that the trial court's findings are at odds with binding judicial admissions Appellee made in its pleadings. Appellee alleged in its complaint that the parties formed an oral contract in November of 2008 and that the contract was silent on the total volume of scrap metal involved or the total purchase price. Appellee's Amended Complaint, 5/6/10, at ¶¶ 5-6. Prior to trial, Appellant filed a motion in *limine* to prevent Appellee from introducing evidence contrary to these admissions. The trial court denied Appellant's motion, and at trial Appellee introduced evidence of an agreement in August, rather than November, of 2008. Appellant believes the trial court erred because its verdict rests on findings inconsistent with Appellee's binding judicial admissions.

This Court has addressed judicial admissions as follows:

> Statements of fact by one party in pleadings, stipulations, testimony, and the like, made for that party's benefit, are termed judicial admissions and are binding on the party. Judicial admissions are deemed true and cannot be contradicted by the admitting party.... Such admissions are considered conclusive in the cause of action in which they are made—and any appeals thereof ...—and the opposing party need not offer further evidence to prove the fact admitted.

---

[2] The parties dispute whether Appellant's payment constitutes partial or full payment. That distinction does not alter the statute of frauds analysis.

For an averment to qualify as a judicial admission, it must be a clear and unequivocal admission of fact. Judicial admissions are limited in scope to factual matters otherwise requiring evidentiary proof, and are exclusive of legal theories and conclusions of law. The fact must have been unequivocally admitted and not be merely one interpretation of the statement that is purported to be a judicial admission. An admission is not conclusively binding when the statement is indeterminate, inconsistent, or ambiguous. When there is uncertainty surrounding a conceded fact, it is the role of the judge or jury as fact finder to determine which facts have been adequately proved and which must be rejected.

*Cogley v. Duncan*, 32 A.3d 1288, 1292 (Pa. Super. 2011) (quoting *John B. Conomos, Inc. v. Sun Co.*, 831 A.2d 696, 712-13 (Pa. Super. 2003), *appeal denied*, 845 A.2d 818 (Pa. 2004)).

The averments in question read as follows:

5. In about late November, 2008, [Appellant] orally agreed with [Appellee] at [Appellee's] above-stated place of business (hereinafter referred to as [Appellee's] 'Lot'), that [Appellant] would purchase scrap metal from [Appellee's] inventory of automobiles and trucks at a purchase price of $13.50 per hundred pound (hereinafter referred to as the 'Agreement').

6. At the time of the Agreement, [Appellee] and [Appellant] did not discuss the total amount of pounds of scrap metal that [Appellant] would purchase from [Appellee], or the total price that [Appellant] would pay to [Appellee], or what specific scrap metal [Appellant] would select for purchase, or how many truckloads [Appellant] would purchase, or how many times [Appellant] would come to the Lot.

Appellee's Amended Complaint, 5/6/10, at ¶¶ 5-6.

Ultimately, the trial court found the parties entered into an oral agreement. The trial court reasoned that "about late November" per paragraph five of the amended complaint was simply an estimate that was

broad enough to include August of 2008. We affirm the court's conclusion, albeit for different reasons.[3] Paragraph five of the amended complaint contains two allegations of fact pertinent to our analysis of Appellant's judicial admissions argument—(1) that Appellant agreed to pay $13.50 per hundred pounds of scrap, and (2) the agreement occurred in "about late November" of 2008. Appellee's Amended Complaint, 5/6/10, at ¶ 5. In discovery and during trial, Gina Myers, the president of Beecher's Auto Salvage, testified that her November 2008 conversation with Bret Wollaston, Appellant's vice president for business development, was merely a confirmation of a deal the parties reached in August of 2008.[4] The trial court credited Myers' testimony and found that the November 2008 agreement was simply a confirmation of an earlier agreement.

We do not believe the allegations in Paragraph 5 of the Amended Complaint are judicial admissions that barred Myers' account of the August 2008 conversation. First, Myers' account of the price term did not conflict with the complaint. She testified consistently that the parties agreed to $13.50 per one hundred pounds. Second, concerning the timing, we do not believe paragraph 5 of the amended complaint forecloses the possibility that

---

[3] We may affirm the trial court's decision on any valid basis. **Plasticert, Inc. v. Westfield Ins. Co.**, 923 A.2d 489, 492 (Pa. Super. 2007).

[4] Myers' testimony in discovery prompted Appellant's motion *in limine*.

the November 2008 agreement was a confirmation of an earlier agreement.[5]

Myers did not attempt to retract the allegation in the complaint. Rather, she testified, consistently with paragraph 5, that Wollaston assented to the $13.50 price term in November of 2008. N.T. Trial, 5/6/14, at 20-21, 99-100.

Likewise, we do not believe Myers offered any testimony to contradict the allegations in paragraph 6 of the amended complaint. Rather, paragraph 6 was simply an accurate description of trade usage in the scrap industry, as the trial court found:

> The contract is further supported by the usage of trade within the scrap metal industry. All of the witnesses agreed that businesses within the industry do not use written contracts. A price is agreed upon, the scrap is hauled away, at some point it is weighed, and the price is paid. Here, while it may be in dispute now, a price was agreed upon; over 1 million pounds of scrap metal were hauled away from [Appellee] by [Appellant]; and [Appellant] paid [Appellee] over the course of several months. These facts are consistent with usage of trade within the industry.

Trial Court Opinion, 9/4/14, at 10-11; *see also* 13 Pa.C.S.A. § 1303(c).[6]

Even if we assume the allegations in paragraph 6 constitute binding judicial

---

[5] As a matter of law, the timing is of no significance, as § 2204(b) of the UCC provides that "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." 13 Pa.C.S.A. § 2204(b).

[6] Section 1303(c) provides:

*(Footnote Continued Next Page)*

admissions, Appellant cannot obtain relief because Appellee's evidence at trial was consistent with those allegations.

In summary, Appellant seeks with its judicial admissions argument to undermine the record evidence concerning the formation of the parties' agreement—particularly the alleged August 2008 conversation between Myers and Wollaston—and thereby persuade this Court to hold that the trial court erred in finding an agreement on the $13.50 per one hundred pound price term. Appellant believes the evidence simply cannot support a conclusion that it agreed to that price term given the state of the scrap market in November of 2008. For the reasons described above, we do not believe Appellant's judicial admissions argument merits any relief, as Appellee did not contradict the allegations in its complaint at trial. For reasons described below, we believe the trial court's findings rested on its credibility determinations and its assessment of the objective data regarding the amounts of money and scrap metal that changed hands. Ultimately, we

_(Footnote Continued)_ ─────────────

> A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as fact. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

13 Pa.C.S.A. § 1303(c).

conclude that the governing standard of review does not permit this Court to disturb the trial court's findings in this case.

In its third assertion of error, Appellant argues that the trial court erred in finding that the parties agreed on a price of $13.50 per one hundred pounds of scrap. Appellant argues that no evidence supports a conclusion that it quoted Appellee a price of $13.50 per one hundred pounds in August of 2008; that Appellant would not have quoted such a price because all of its manpower was invested in another job in August and September of 2008; that it is contrary to industry practice to quote a price for a job that does not commence until more than four months later; and that Appellant would not have agreed or reaffirmed an agreement to pay $13.50 per one hundred pounds in November of 2008 because the scrap metal market crashed. In essence, Appellant argues that the trial court's findings lack competent evidentiary support in the record. *See Allegheny County Hous. Auth.* 908 A.2d at 340 ("Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence[.]").

We begin with a recitation of the trial court's findings on this issue:

> There are three witnesses that testified to communications between the parties as to an agreement for [Appellee] to sell [Appellant] scrap metal: Ms. Myers and Mr. [Keith] Myers, the president and vice-president of [Appellee] respectively, and Mr. Wollaston[.] Ms. Myers testified that in August 2008 at Beecher's Mr. Wollaston agreed to buy scrap metal from [Appellee] at $13.50 per hundred pounds after Mr. Myers

explained to Mr. Wollaston that she needed to 'clean her lot out.' Ms. Myers testified:

> Q. What happened next then?
>
> A. Then I had a discussion with Bret [Wollaston] in August 2008, told him I had no room. I had to move the inventory.
>
> Q. Did Mr. Wollaston say anything at that time?
>
> A. Yes. He told me that my price would be thirteen fifty at that time and that he did perceive the market may go up. I told him it did not matter to me. I was willing to accept the thirteen fifty. I just need to clean my lot out.
>
> Q. Was anyone else present during that conversation?
>
> A. No.
>
> Q. Where did that take place?
>
> A. At Beecher's Auto Salvage.

[N.T. Trial, 5/6/14, at 17-18]. In relation to the quantity Ms. Myers indicated that Mr. Wollaston was to take prepared scrap metal at the bottom of the field at Beecher's, weigh it, and pay for the amount taken.[7] Ms. Myers' version of the agreement was that Mr. Wollaston agreed to buy scrap metal for $13.50 per hundred pounds. Ms. Myers further testified that Mr. Wollaston confirmed the price of $13.50 per hundred pounds in November of 2008 and Mr. Myers explained that he heard the confirmation of the price as well.

---

[7] Given the practice of removing, weighing and then paying for scrap metal, it makes sense that the parties did not agree on the total poundage. The poundage could not be determined until Appellant weighed the scrap it removed from Appellee's yard. The absence of any agreement on total poundage does not undermine the trial court's finding that the parties entered an enforceable oral agreement.

Mr. Wollaston's version of the agreement is much different. He claims that no talks as to any agreement between himself and Ms. Myers took place in August 2008. He does however allege that he and Ms. Myers had a conversation at Beecher's in late November 2008.

> [S]he was telling me she was full, needed to get something done. We talked. I told her the market crashed, not much I could do, and she said, well, ou [sic] know, I wanted to know—the only thing I can do for you, I made her an offer that we would come in and crush. We made a business decision to hold our scrap until the market went back up to $300 [per] ton.
>
> Our business decided we couldn't sell for less than that. We had too much money in our inventory and I said whatever we do crushing at, that number, that's what we would settle on, but if the market went up to four fifty or four hundred then, yea, she would benefit from that as well or five hundred or wherever it ended up, she would benefit as well, but that was the only conversation we had, and we could have moved in at any time after September because we had no work at all. Our guys were sitting after we got the job down from Ernie's, so we—it was th [sic] end of November so Thanksgiving so Thanksgiving, Christmas came around, so we decided we would just go in in January and it didn't really matter when we went in because there was no determined price for me to have to worry about what I was going to have to sell it for to take a loss or not …

[N.T. Trial, 5/7/14, at 142-43]. Mr. Wollaston essentially asserted that the agreement between him and Ms. Myers was that he would crush and haul away the scrap metal at Beecher's according to what Ms. Myers said he could take and hold onto it until such a time that the market reached at least $300 per ton and at that point he would pay Beecher's $7.50 per hundred pounds.

Trial Court Opinion, 9/4/14, at 7-9.

The trial court found Mr. Wollaston's version of the agreement not credible:

> An agreement whereby one would turnover its goods only to wait in potential perpetuity for the market to perhaps rise to [a] certain level in order to receive payment for said goods is improbable. In this case [Appellee] would have had to agreed [sic] to permit [Appellant] to haul away 1,252,630 pounds of scrap metal and hold onto it without payment for an indeterminate period of time. Furthermore, [Appellant] paid [Appellee] $110,000 in several monthly payments from December 2008 to October 2009. If the agreement was for [Appellant] to hold the scrap metal until some future time when the market escalated to $300 per ton it is nonsensical that it would make payments to [Appellee] prior to that time. [. . .] Additionally [. . .] the payments calculated out to $9.096 per hundred pounds and Mr. Wollaston admitted that fact. When questioned about why [Appellant] paid [Appellee] $9.096 per hundred pounds he stated: "That is correct. We overpaid her." [. . .] We find it hard to believe that a well-established company in the scrap metal industry would overpay for its purchases accidentally or purposefully for that matter. [. . .]
>
> It is also evident that the price [Appellant] paid to [Appellee] in August 2008 was $13.50 per hundred pounds.[8] Ms. Myers testified that she sold to [Appellant] on August 6, 2008 and [Appellant] initially paid $12.50 per hundred pounds. After Ms. Myers observed the error she contracted [sic] Mr. Wollaston who paid her an adjustment check on August 19, 2008 in the amount of $110 which brought the total payment per hundred pounds from the August 6, 2008 transaction to $13.50 per hundred pounds.

*Id.* at 13-15 (record citations omitted).

Appellant argues the record does not support the trial court's findings because both parties' experts testified that Myers' version of the agreement

---

[8] Here the trial court is referencing August 2008 transactions between the parties that were not part of the agreement in dispute in this lawsuit.

is contrary to industry practice. That is, it would be contrary to industry practice for Appellant to agree in November on a price for scrap that Appellee would not haul away until the following January. Both expert witnesses testified that prices are never set months in advance. Appellant also asserts that it never would have agreed to a $13.50 price term in November of 2008, given the prevailing market conditions at that time. Likewise, Appellant asserts that the scrap it purchased for $13.50 per hundred pounds in August of 2008 was prepared for shredding, whereas the scrap it removed from Appellee's lot in early 2009 was unprepared. Unprepared scrap entails higher processing costs, according to Appellant.

First, we observe that even if the trial court accepted the expert testimony as to prevailing industry practices, the court remained free to find that the parties did not act in accordance with industry practice in this case. Gina Myers testified that the parties initially agreed on the price in August of 2008. Wollaston testified that Appellant undertook a very large project requiring all of its manpower in August and September of 2008. N.T. Trial, 5/7/14, at 140-41. Thus, Appellant could not have commenced work in removing scrap from Appellee's lot until October at the earliest. The trial court was free to find that Wollaston agreed to honor the $13.50 per one-hundred pound price term in November of 2008, despite the downturn in the market.

Moreover, Appellant's dealings with Appellee in this case are not consistent with Wollaston's assessment of the late-2008 scrap market crash. Wollaston testified that Appellant was paying $3.50 per hundred pounds of scrap when Appellant began crushing and removing scrap metal from Appellee's lot in January of 2009. N.T. Trial, 5/7/14, at 145. Despite that, the record indicates that Appellant commenced payment to Appellee with a $10,000.00 advance in December of 2008 and another $20,000.00 in early 2009 shortly after Appellant removed the scrap from Appellee's lot. Appellant's total payment—$110,000.00 for 1,252,630 pounds of scrap— computes to just over $9.00 per one hundred pounds.

Appellant also argues that the scrap it bought from Appellee in August of 2008 was more valuable because the scrap it purchased in August required less processing. That is, the August 2008 scrap metal was in a "roll-off can" that Appellant periodically emptied, whereas the scrap subject to the agreement in dispute consisted of automobiles that Appellant had to crush and then remove from Appellee's lot. *See* Appellant's Brief at 136; N.T. Trial, 5/7/14, at 139-142. The trial court did not make specific findings on the difference in kind or value, if any, of the scrap Appellant purchased in August 2008 and the kinds it removed from Appellee's lot in early 2009. Implicit in the court's verdict is that it rejected any such distinction. The record is not a model of clarity on the issue, and we have no basis upon which to disturb the trial court's findings.

In light of all the foregoing, we conclude that our standard of appellate review precludes relief on Appellant's third argument. Witnesses for Appellant and Appellee presented the trial court with conflicting evidence as to the terms of the parties' agreement. The trial court credited the testimony of Gina and Keith Myers and discredited that of Wollaston. The trial court also relied on objective evidence indicating that Appellant paid Appellee $13.50 for scrap in August of 2008. Viewing the evidence of record in a light most favorable to Appellee, as verdict winner, we conclude that competent evidence of record supports the trial court's findings of fact.

In its fourth assertion of error, Appellant argues the trial court misapplied § 2305 of the Pennsylvania Uniform Commercial Code. That section, titled "Open Price Term," provides in part:

> **(a) General rule.**--The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:
>
>> (1) nothing is said as to price;
>>
>> (2) the price is left to be agreed by the parties and they fail to agree; or
>>
>> (3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

13 Pa.C.S.A. § 2305.

Appellant's argument depends entirely upon its assertion that the parties did not agree to a price term. We have already concluded that the trial court did not err in finding that the parties agreed to a price term of

$13.50 per one hundred pounds of scrap. As such, we have no occasion to address Appellant's open price term argument under § 2305.

Finally, Appellant argues that the trial court erred in finding that the parties' November 2008 conversation was a confirmation of the August 2008 agreement. Appellant believes the trial court erred in creating a contract for the parties rather than simply enforcing the ascertainable terms of the parties' agreement. The underpinnings of this argument are essentially the same as those offered in support Appellant's third assertion of error, and the argument fails for reasons we have already explained above. In short, the record supports the trial court's finding on the price term, and the record does not support a conclusion that the trial court created or reformed a contract on behalf of the parties.

For all of the foregoing reasons, we conclude that Appellant's assertions of error do not merit relief. We therefore affirm the judgment.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/29/2015

- 19 -